Flores was charged with child endangerment. The government was required to prove that he intentionally, knowingly, recklessly, or with criminal negligence, deprived his child of adequate food, which led to an imminent bodily injury. The evidence was insufficient. The evidence specifically said, showed conclusively there was not an imminent danger of bodily injury in this case. Flores and his daughter left the Western District of Texas for Mexico on the morning of February 13th of 2022 by unwittingly crossing the Rio Grande River. After they did that, they were encountered by a Mexican citizen who did not perceive an imminent injury requiring intervention, but that Mexican citizen was aware of a search and rescue mission for Mr. Flores and his daughter, so he reported their location to U.S. park rangers. U.S. park rangers then, the next morning on February 14th, were able to hike up to an Mexico. They similarly did not perceive an imminent injury requiring intervention. Rather, they saw Mr. Flores and his daughter dressed for the weather. They saw his daughter walking around building a campfire, nothing to indicate that she was about to succumb to an injury due to a lack of nutrition. Later that day, Mexican police encountered Mr. Flores and his daughter. Those Mexican police officers were specifically asked if they saw any signs of endangerment or injury. They emphatically stated that they did not. Those Mexican police officers then transferred custody of Mr. Flores and his daughter to United States park rangers. When park rangers received Mrs. Flores and his daughter, they did not perceive a need for medical treatment or even medical injury. Those facts established conclusively, there was not an imminent injury as contemplated by Texas law. Texas law requires the injury to be almost immediate or impending. They say it must be any pain and menacingly overhead. Applying the Texas Court of Criminal Appeals decision in Garcia, which dealt with a toddler who was in a white wet diaper during 50 degree weather, was cold to the touch, had blue lips and mucus running down its nose. The Texas Court of Criminal There was no evidence that the child was experiencing pain and there was no move by the officials encountering her to take her for medical treatment. Similarly here, Flores' daughter testified that she was not in pain. The most that she said that she felt during her journey with Mr. Flores was that at some point she would like to eat food that she would actually enjoy and that she was hungry. Not only did the government fail to show an imminent bodily injury, the evidence was also completely absent as to Mr. Flores' mens rea. Mr. Flores' daughter testified that he did not knowingly or intentionally deprive her of food. She testified that they had brought food with them, that he gave that food to her and shared it with her, that he shared with her food that they found along the way, both through scavenging for it and for asking other people if they had food that they could have. This was not sort of an airplane situation where in the case of an emergency you take care of yourself and then you look to your child. The evidence showed that Mr. Flores provided for his daughter and gave her the food that they had available. That leaves the government with the idea that he intentionally or knowingly drove down Old Ore Road in the course of getting from the entrance of Big Bend to Boquillas, Mexico. The government, that does not by itself show an imminent injury of a bodily injury due to a lack of nutrition. That while they were driving down that road, they experienced an emergency. They sustained a flat tire, drove off into a wash because of that, and then... Counsel, let me stop you on that point. On the flat tire, there's no evidence in the record, I mean, it's undisputed that that was unintentional. Yes, Your Honor. So government, both sides, no one's disputing that fact. That's my understanding of the government's position, yes, Your Honor. And then Flores' daughter testified that they waited around the car for several days after that. From the record, it looks like it was between three and five days, which meant that they did what you're supposed to do in an emergency. They stayed put and waited for help to come. Fortunately, they had water and food that they had brought with them that sustained them for that period of time. But at some point, they made the decision that no one was coming to help and that they needed to try to walk out of this. You've referenced several times that the daughter testified. Was she, my understanding, she was about nine years old at the time of the events, correct? Yes, Your Honor. And about the time she testified would be around that same age, nine or ten? Yes, Your Honor. I think your suggestion here is that they were trying to get help. They were, as you said, walk out. Well, why didn't they ask the hikers for help? So they asked the hikers for food. But why didn't they ask the hikers, help us get out of here, help us get home, help us get our car fixed, help us get more food? Judge Richmond, I think that's the natural question. There's no evidence in the record why they didn't ask, whether they asked them. But they didn't? There's no record, there's no evidence they did or didn't. I'm just, it's inconsistent with your theory that they were trying to walk out to get help. No, Your Honor, I don't think so. So they, they, all we know about their encounter with the hikers is they received granola bars from them. And then, so it was after that they encountered kayakers who they did ask, where are we? And those kayakers told them that they were on the Rio Grande River. So I think the evidence that they had crossed the Rio Grande River, they didn't realize that it was the Rio Grande River. What Flores' daughter testifies is that they were surprised that they learned that they had crossed into Mexico when they asked the kayakers where they were. And her testimony was that their intention, once they learned that, was the next day to proceed over to the town of Boquillas. But from what we can tell from the record, it's not clear that the hikers were in a position to help them or, you know, that they realized that they could seek help from the hikers. The record does show that they didn't realize that there was a search and rescue mission ongoing for them. So I, I, I, your question is a good one, but the record doesn't tell us one way or the other whether they sought additional help, just that they took the help that they could receive from them. But there were certainly evidence that the father intended to take them out for a very long period of time, survivalist type situation, off the grid situation. I don't read that as shown in the evidence, your honor. So the evidence was that they were trying to drive to Boquillas, Mexico, which is a town with restaurants and people living there, that it's not a place where you go as a part of a survivalist trip. So I don't think the record shows that. I think the record shows that they were trying to get to Boquillas, Mexico. But anyways, I'll. What would that distance be just from out from here, from where he started to? So he started in Fort Stockton. The distance from Fort Stockton to the entrance of the National Park is about an hour. You drive through one town of Marathon and then you drive further on. It's about an hour, hour and a half. And then the entrance of the park to Boquillas, Mexico, if you drove it on the route that I normally take to drive it, is probably about another hour, hour and a half drive, probably closer to an hour. But the question you ask is interesting, Judge Stewart, because the road that they took, when you enter the park, there's a little station there, but there's not much. And sometimes that station isn't manned. And then when they took the habitation there at all. So the closer, once they sustained the flat tire in the middle of Oldor Road, the closest they could have gotten to help was Boquillas, Mexico. So they very much headed in the direction of help. And if you look at Defense Exhibit 2 in the record, you can see the map. And it's pretty clear. That's the same map that they received when they checked into the station. It's pretty clear that south was the way to go. Not to belabor the point, I misunderstood. Does the record tell what his original destination was? It was after they had the flat, he was trying to get to Boquillas, Mexico, is that right? Throughout this journey, that was the object. I'm trying to connect up the food that was in the vehicle from when they started. What's the argument about that was enough food to get them from point A to where? I mean, what was it just to be in Big Bend, you know, indefinitely to camp until they run out? I mean, what, is there any evidence in the record that tells us one way or the other? There wasn't record in the evidence that tells us one way or the other. What the government urges is that, you know, it is dangerous to travel in Big Bend at all. I'll ask it one other way. Since you've talked about the daughter, was the daughter able to say, or in her testimony, was she asked, you know, like, what was her understanding the trip was for? In other words, did she say we were going camping or anything? I haven't read her testimony. She said that they were going to Mexico, but she wasn't able to articulate a reason why. Okay, okay. But I think the court's questions about what was the purpose of this trip sort of gets to, you know, the government identifies what knowingly and intentionally happened as driving down the that doesn't pose a risk of starvation. The question becomes then whether there was a substantial and unjustifiable risk of having inadequate food by driving down that road, or Judge Richmond, if the government does change its position and say this must have been some sort of survivalist camping trip, whether that sort of undertaking shows a substantial and unjustifiable risk of having a lack of food. And in order to show criminal negligence, the government has to show that Mr. Flores disregarded that risk. In order to show recklessness, the government had to pass, or didn't, for negligence, they have to show that he didn't, wasn't aware of the risk, and for recklessness, that being aware of the risk, that he disregarded it. And the evidence contradicts that. He, as Judge Stewart, you point out, he did have a fair amount of food. Well, talk about the fair amount of food. What did he have there? Because if he's going down the road in a car for a few hour trip, how much food is that? But it ended up being a two-week trip, right? It ended up being a two-week trip. I think it was, if you're going to cross into, go all the way down and cross into Boquillas, it's going to be at least a day, if not a two-day trip, to start off with, if you're planning to go and come back. But it did end up being a two-week trip. He had... A day and a half in a car. I'm sorry? If the intervening flat tire... Yes, Your Honor. ...that both sides do not dispute was unintentional. There's no evidence of a knife being put into there. How much, if he didn't have the flat tire from point A to point B, where he was going to go, how much, how long did that take and how much food was in there? It would... In the car? If you drove it and went and came back right away, it would take four to five hours. If you're going with the purpose of doing anything, you're going to not go straight back. So it's going to be a day, maybe a two-day trip. Now I understand what you're saying. And how much, quantify please, because the whole issue here is whether, well, one of the big issues is whether there was enough food. Correct. Right? Yes, Your Honor. Which relates to the endangerment of the child. Yes, Your Honor. Either through malnourishment or there was talk about hunger pangs here. Those are the two areas of injury to the child, malnourishment or hunger pangs. So the food amount could be important. Well, I think you really only get to the food amount if you say that he didn't have enough food for the planned one to maybe two days. That's what I'm getting at. I agree. So how much was there? So he had loaves of bread. He had multiple cans of Spam, multiple cans of beans. He had just general things. But it was also the way he was living was perhaps not the way you and I would take a trip. There was some evidence that they kind of lived in their car at different points and that he had a lot of things in his car that you wouldn't put in just for the trip. So there was a substantial amount of food. There was more than enough food for whatever risk was posed by taking a trip down to the National Park and planning to come back in the next day or two. But also, the government not only had to show a substantial risk by what Mr. Flores intentionally did, which was drive down the road, but also an unjustifiable risk. Here, there is justification for this risk. People travel the old road all the time. It's a legitimate route to get to Boquillas. It's also just something you might do as part of the general enjoyment of going to Big Bend National Park. So this was not like the Texas cases where people leave out methamphetamine. There's no good reason for doing that. Here, there is good reason for going on a trip in Big Bend National Park. As I've discussed, he did bring food. So I don't think he disregarded any risk. And then we get to the adequacy of the food. And the government attempts to say there was hiking trip that lasted 20 miles. Well, the evidence contradicts that. The only Texas court case to deal with adequacy of nutrition is Contreras. That examines the health effects that were experienced by the child, not what a government official would recommend that a child receive. And in that case, the court looked to the fact that the child was initiated, the fact that the child went hospitalized, received additional nutrients, and resumed a normal schedule to determine that the food had been inadequate. Here, the fact that Mr. Flores' daughter was completely uninjured shows that she did not receive inadequate food. She appears to have received adequate food and prospered accordingly. The government, recognizing the weakness of its case, urged conviction on a range of other theories outside of what we're discussing. For that reason, Flores also argues that they constructively amended the indictment, which deprived him of his right to be charged by a grand jury. Thank you. And please, the court, Lauren Tanner Bradley from the United States. I'd like to start just by bringing this court back to the standard of review, which is something that appellant is ignoring here. This court, in a sufficiency of the evidence challenge, reviews the evidence in the light most favorable to the verdict. It makes reasonable inferences in favor of the verdict. It makes credibility determinations in favor of the verdict. And it resolves conflicts in the evidence in favor of the verdict. Now, when you apply that standard and you look at the record here, we see that Mr. Flores took his nine-year-old daughter survival camping. That's in her own words, at 7-09 in the record. He took her survival camping in one of the... He used the word survival camping. She referred to what they were doing as survival camping at 7-09. This was in one of the most remote parts of the country, in the dead of winter, without adequate clothing, shelter, and most importantly, without adequate food. She testified that they ran out of food in three days. That's at 7-02, 7-28, and 7-29. Three days they ran out of food. It was at that point that they started, for the next 14 days, hiking 20 miles as the crow flies. That's at 4-20. And during that time, they subsisted off of approximately 30 cactus berries a day, a couple of minnows, and a dead frog. That's 7-03 to 7-04 and 7-19. They were so hungry that they ate a dead frog. For four of those days, his daughter reported to the park ranger that they had nothing to eat for four days, 4-53 and 4-55. Despite having gone four days without eating anything at all, Mr. Flores did not seek help from hikers. He did not seek help from kayakers. His daughter testified that they saw helicopters flying overhead and that they did not attempt to wave them down. And that's at 7-08. In her own words, they just kept walking, living off the land. And that's at 7-74 to 7-75. Based on this evidence, a reasonable jury could determine that Flores failed to provide his daughter with adequate food, that there was an imminent danger of bodily injury, physical or mental impairment, and that he knew or should have known that there was a substantial and unjustifiable risk. And by ignoring that, he grossly deviated from the standard of care of an ordinary person. I'd like to touch on just a couple of other things that the court brought up. Was there evidence that this was supposed to be a short weekend trip? As the court pointed out, he unenrolled his daughter from school. He checked out survival books. He had survival books with him on the trip. He had things like water purifying tablets. All of this, from this evidence, the jury could reasonably infer that it was not his intention to simply go down to Boquillas, Mexico for a day trip. His intention was to go survival camping with his nine-year-old daughter. I'd like to touch on, we had some conversations about the daughter's testimony. As you pointed out, the daughter was nine or 10 years old at the time that she testified. The jury is entitled to rely on its common sense about what constitutes bodily injury, physical pain, impairment. And the jury could discredit her testimony in that setting about whether or not she experienced pain in that moment. There's no requirement under Texas law that we demonstrate actual injury. There is no requirement under Texas law that there is medical intervention. And I'd like to also speak to Garcia quickly because I think that if the court goes back to that Garcia case, you'll see that there is significant weight placed on the temporal element of the child's situation in that setting. That was a case where the mother is actually approaching an apartment door with her child, is only in a diaper. She's seeking out help at the doorstep. She's there for a moment of minutes. The person who was in the apartment does not open the door for her. And so the mother actually takes her child and shelters in an unlocked car at that point. And there's evidence in that record, I believe, that she was there for six minutes before emergency responders came. And so in that case, the court placed a significant weight on the fact that there really wasn't evidence in that record based on that very short period of time that there was bodily pain or bodily injury or physical or mental impairment under those situations. Is the government saying that the endangerment happened sometime after day three? Because it doesn't sound like you're contesting that there was insufficient food for three days, right? There was sufficient food. Well, there's certainly testimony support that, yes, that at that three days, that's when they ran out of food. All right. And the way the trial played out, it's the government's position that days possibly four through 14 is when the child endangerment happened at the jury. Yes, I think at any point during that period of time. And that's based on other evidence in the record, because it's unclear from the record whether or not he purposely drove into this wash and then suffered the flat tire or if for some reason the flat tire took him off. But that was he was 500 feet from the visible roadway. They were camping when they were supposedly seeking help. They were camping in a non-visible location from the roadway. And then when they run out of food for three days, instead of going to the one roadway that exists, instead of camping near that roadway, instead of the very many things that he could have done, like honk the horn for help. OK, so it's his actions or inactions that Mr. Flores undertook or did not undertake from the moment that they ran out of food after the unintentional flat tire. To when they were found. Is that the period of time? Yes. OK. And is it the government's position at all? It crossed my mind that a lot of people take their kids to Big Bend, right? Yes. And there are a lot of communities and people that will take their kids to do camping and being in the wilderness and so on. The government's position that you should come equipped with two weeks worth of food with every trip that you go or I understand your position better now in that if you're saying his action and inaction from day four to 14 is what supports the jury verdict under the standard of review. Yes. You're not. Am I correct in understanding that you're not saying that every parent that goes out needs to pack two weeks worth of food when you go camping? Certainly not. OK, so that is certainly not the government's position. And in this situation, you have an individual who is making so within the recklessness and criminal negligence standard that you need the substantial and unjustifiable risk and that you're grossly deviating from the standard of reasonable care. And so every step you took further from that campsite within after they've run out of food, further from rescue and not seeking the aid. I mean, certainly by the time they've gone without food for four days and they do not see any aid from hikers, packers or a helicopter, that all indicates a gross deviation from the standard of care, despite there being a clear risk that they do not have adequate food for this journey that they're on under very stressful conditions. There was some indication in the record that Mr. Flores may have had mental challenges, correct? It's my understanding somewhere in there that there was a seeking psychiatric evaluation. Does that where I'm going with that is if that is true, does that play into the mens rea component, mens rea component at all? I do not believe that that plays into the mens rea component. And I'm, I, in terms of like a competency or I guess I'm a little bit, well, first of all, you haven't, I probably interrupted you too soon. You really haven't addressed the mens rea component. So in terms of mens rea, you have the substantial and unjustifiable risk. And I think that what is shown there really is that every act he took along this way demonstrates that he's not seeking help or seeking rescue. He's actually seeking to be lost in the wilderness. I think that's what the record supports here, that he has all of these survival books. His car is 500 feet from the roadway. They're camping in locations that are not visible. They are not seeking the aid of others by waving down helicopters. They're also, I think a reasonable person under these circumstances would travel down the one road. A reasonable person. Was there anything in the trial or the record to indicate whether he was mentally competent or not? And does that play into the mens rea? I don't believe there's anything in the record, in the trial record with respect to his competency to answer that question. There are other proceedings where it indicates that he was, you know, attempting to love off the grid and had other ideas. That's all. That's not in the actual trial record. I think I understand the government's theory now better. The problem I have, not the ultimate result, but the difficulty I have is this back and forth between what I consider a heightened negligence standard or construct versus somebody who's indicted for a criminal charge. Now, I don't have trouble getting to grossly negligent, whatever range of negligence, you know, one might want to put out there. Bad parent, you know, on and on and on. Something horrendous. I mean, that's not difficult for the jury and all that. But I can see you got 12 people there. I mean, who does this to their child? But if you transpose that kind of heightened gross negligence, what kind of parent is this, to criminal culpability, and that's what, to me, I'm trying to get to where you are in terms of the mens rea. In other words, if you're saying if what he did to start with was at best bad judgment, you know, negligent, yeah, yeah, yeah, and somehow on day 14 is when this criminal culpability triggers, that's the part. I'm not saying I can't get there, but it's all the discussion about, it's taught language that's very pervasive. It's taught language that's pervasive, and that's the struggle I'm dealing with, staying away from what sounds like a strong taught argument versus the person getting it. Now, that's not embracing what he did, don't get me wrong, but to say he didn't ask the hikers, you know, he didn't do this, you know, and somebody else would have done that, you know, the typical hindsight judgment, which we say doesn't get you there, so just help me remove from my mind the negligence type notions. He didn't ask, and you say, well, he didn't try to hail the helicopters and so forth. What's the most potent evidence that the jury had to connect criminal mens rea with Mr. Flores within the four to 14 days? To me, the most potent evidence is that they went four days without any food, and he did not seek help. I think that's incredibly potent. I don't think that's just negligence. That's a gross deviation from the standard of what a reasonable person would do under those circumstances, and it's not just they didn't eat for those four days. It's that prior to those four days, they were subsisting off of 30 cactus berries, a couple of minnows, a dead frog, and I understand that this is torts language to some extent, but this is Texas law. This is child endangerment under Texas law. Texas courts applying it every day. This is a charge that we see. The jury was properly instructed on the elements of this offense, and they... I'm not quarreling with the statute or any of that, and if, as you say, it was a question of the standard review on sufficient evidence, I get all that. I just don't want to go too fast past was there legal error, because you can't... If there's legal error that infects the fact finding, that's reversible. You follow what I'm saying? I'm trying to understand the legal parameters, not just was there enough in the evidence to do it, so let me back up a step. So just the indictment charge, tell me again what? Did not provide adequate food, I believe, was the exact language. I can find the exact jury charge. The indictment is what he asked about. I'm sorry? He asked about the indictment. Yeah, well, in the... I mean, the jury charge included the language of the indictment, and so I believe that the indictment stated that he did not provide adequate food. And I'm not sure... Under these circumstances, I'm not sure I understand the court's question entirely in the sense that this is Texas law. We have a standard that juries are routinely instructed on, and that this jury, based on this evidence, found that this was a gross deviation from the standard of care. Let's talk about the evidence. My calculation is 16 days. Not sure the two days makes a difference, but it was 16 days based on the indictment. When during this whole 16 days that they were out there walking around, when did he see the hikers? When did they see the kayakers? Do we know when on the timeline, how long they'd been out there, when opportunities perhaps to seek help? It is not clear from the record when they saw the hikers. The kayakers, they would have seen, I believe, on February 13th, and that would have been a time period after they had already gone without food for four days. And the helicopter, I believe she testified that that was seen sort of mid-journey, so sometime within the period of days where they've left the campsite and continued to travel towards Mexico. And I can't remember her exact testimony on that, but I believe it would be around 708 to 709. Were those helicopters in fact searching for them? Yes, in fact, and she says that they were black and white helicopters, that they were police helicopters. And there was no effort made to actually flag them down. Under normal circumstances, an ordinary parent would be seeking rescue. And I think that's really where the criminality goes into play, is that this is an individual who is ignoring every possible fact that there is not enough food to feed his daughter. What triggered the search? The search was triggered because I believe it was on February 5th that they located an abandoned truck. Abandoned truck. Yes, and they could tell. And because this is a dangerous location, this is an incredibly dangerous location for people to go missing. And so they immediately started this search and rescue mission to find these people who, as far as the park rangers knew, were just lost in the wilderness. And in this case, the evidence shows that they were intentionally lost in this wilderness by this father. That was the other thing I wanted to get to. The jury heard facts that he had complained to his co-workers about the government and all of that. He quit his job. He quit paying for his phone. He checked out a book on survival books. The book was with him. In the trial record, there's testimony that he was checking out the survival books. I'm not certain that some of the pretrial proceedings information came in to the jury, but there's certainly evidence that he had checked out survival books, that he had unenrolled his daughter from school, which is not something a normal parent does for a weekend trip to Big Bend, and that he had these survival books with him along the way. And then all of the other signs show that he is not seeking a normal, you know, he could have taken the highway to go get them. Let's get to constructive amendment, because to me it's very disturbing that they're out in Big Bend in January with no tent, no winter clothes. Is that a constructive amendment of the indictment? No, certainly not. And those facts, all of those facts speak to, one, whether or not this was your body needs more food under stressful conditions, and two, whether or not he is taking on a substantial and unjustifiable risk and grossly deviating from that standard of care. The jury was entitled to consider all of the evidence, the totality of the circumstances, to ascertain if he was behaving in gross deviation of that standard. And also in this case, we have, you know, a properly charged jury, and so the jury was properly charged on, or instructed as to the charge, told to only convict based on the charge and to not consider other acts. And all of those, all of those instructions shear from the possibility. What was the jury argument? Did you say, well, even if you think she had enough food to eat, she could have died from exposure. Did that, was that argument? No, there was not an argument that this individual could have died from exposure, and actually, prosecution repeatedly, actually directed the jury back to the instructions and repeatedly referenced food in its actual closing argument. And I don't have those sites for you, but it was a repeated reference to the fact that there was no food, and that when you consider the totality of these circumstances, that he was not behaving in a way that was reasonable. Nothing about his behavior was justified. He was not seeking aid. He was seeking to, as in Luna's own words, they just kept on walking, living off the land, after they went four days without eating. If there are no further questions, I will take a seat. Thank you. So, all of the available evidence indicated that this was not an intentional 20-mile hike. I just respectfully disagree. Okay. You can argue that, it could be argued to the jury, but there's certainly evidence that this, they were not just driving and had a flat tire and didn't make it to their... So, I would direct the court to the daughter's testimony. She was asked, and after the car broke down, what did y'all do? She said, did y'all know what to do? She said, no, not really. She was asked, you kind of stuck around the car for a few days. She said, yes. Did anyone come looking for you? No. Was there anybody to ask for help? No. Is that when you decided to start walking? Yes. So, they started walking because the car was broke down. They waited around the car... That's not the only evidence. You're talking about a nine-year-old child. Did she know her father had checked out a survival book? Yes. And did she knew it was in the car with her? Yes, and they actually took it on with them. All right, but she, the jury's entitled to draw their own inferences, not what the nine-year-old's inferences were. I agree. She saw the helicopter, the police helicopter. She knew it was a police helicopter. The jury's have drawn the same inference. He could have asked hikers for help. She may not have thought of that. He could have asked kayakers for help. She may not have thought of that. The jury's entitled to consider that. I agree, Your Honor, but... And that she didn't take warm clothes or... They did have warm clothes. If you look at the picture... Not if you have a snowstorm and big bend in January or February. Yes, Your Honor, but I do want to urge, they did ask the kayakers and hikers for help. Not to help get back anywhere. So, we don't know what they asked them. We know that they received food from them, and that's what the record tells us. We don't know why, whether there was a larger conversation or what happened there, but we know that... So, the record says about the helicopters that she saw a helicopter flying overhead and that he didn't try to wave it down. The record also says that a person who's the subject of a search in this kind of situation would not necessarily know... That's a jury argument. It's not a question. Is there no evidence to support a reasonable inference that he was out in survival mode? Your Honor, I think a reasonable jury would have to disregard almost all of the evidence about that this was an accident and that they were not intending to continue to survive out there. They wouldn't... If they were trying to do that, they wouldn't go up to the hikers and say, can we have some food? They wouldn't go to the kayakers and say, can we have a wrap in an orange? They would hide from them. Well, I understand your argument from days one to maybe four, but what about his actions or inactions from four to 14 or 16? So, they're there for four days. They don't have any help coming. There's no indication of that. They're running low on food and they're faced with a choice about what to do. They don't know that the park rangers are going to find the truck on February 5th. And faced with that choice, he decides that they have to try to walk out. We don't know when they encounter the hikers, but when they do, they say, can we have some food? When they encounter... Did they ever say, can I use your phone? Do you have a phone? We don't know if they asked that. There's not good cell reception in Big Bend. We don't know anything about the interaction. We know that a phone call was not made. Well, yes, correct. We don't know whether there was... We don't know whether... We just really don't know what the interaction was. But I'll take the court's invitation and pivot from that point. What I really... I mean, the reason why I led with it, and I think the argument about what a reasonable jury could infer is strongest here, is that they cannot infer that there was an imminent danger of bodily injury. When park rangers know what... The park rangers have seen... Found the truck on February 5th, searched a large search and rescue mission, recover this child over 24 hours after she's left the Western District of Texas, and make the determination that she doesn't need to see a doctor. Imminent danger of... Not that it actually occurred, right? Right, Your Honor. But if you read the Texas cases, it has to be really on the point of occurring. And so she left Texas on February 13th. On the evening of February 14th, they're looking at her and saying she doesn't even need to see a doctor. And these are park rangers who know that she's been in the desert for two weeks, know that they've been looking for her for since February 5th. And... That's just one factor. I agree, Your Honor. But the Texas courts tell us that... They could have been out there another 30 days. That's... It's, you know, did... Do you have to... It's not a crime until she's on the death door? Your Honor, it's not a crime until there's an injury that's imminent. And if she's gone over a day outside of the Western District of Texas and no injury has developed... Can't a reasonable inference be drawn that he had no intention of coming in, in any time... Reasonable time frame? But that's... So we looked... We don't look to whether he intended to come in or not. She testified... The only evidence on that is that she testified that they... When they learned that they were in Mexico, that they intended to go to Boquillas the next day, the town where there is food and supplies. But that's the only evidence on that. But when we look to whether he committed the crime of child endangerment, we look to what he actually did, not what he might have done. And the Texas law tells us that if people in a position to intervene do not recognize the need to intervene, and that comes from a Texas case in which there's a child walking on a road, and the Texas courts say, well, there wasn't traffic on the road at the time, so an injury wasn't imminent. And the person who saw that did not feel the need to intervene. Here we have in Mexico... They picked them up. Well... So the Mexican citizen didn't pick them up on the 13th. The park rangers who saw her the morning of the 14th didn't pick her up. The Mexican police picked them up the afternoon of the 14th because there was a search and rescue mission for them, not because they perceived that she was about to be in imminent danger. They were asked, was there any sign of child endangerment? And they said, no, no, no. They were emphatic that there was no sign of endangerment or injury to the child. So that shows conclusively that there was not an imminent danger of bodily injury when he left the Western District of Texas with his daughter on the 13th. Your time's expired on this appeal. Thank you. The next one is 23-50128. You're up.